UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
MAL HUSEINOVIC,                                               :
                                                              :      **MEMORANDUM**
                                    Plaintiff,                :      **DECISION & ORDER**
                                                              :
                   - against -                                :      17-cv-5466 (BMC)
                                                              :
COMMISSIONER OF SOCIAL SECURITY,                              :
                                                              :
                                    Defendant.                :
------------------------------------------------------------- X

**COGAN**, District Judge.

1.      Plaintiff is a 30-year old former porter who injured his back on the job.  He seeks

review of the decision of the Commissioner of Social Security, following a hearing before an

Administrative Law Judge, that he is not disabled for the purpose of receiving disability benefits.

The ALJ found that plaintiff has severe impairments of history of lumbar and lumbosacral

herniated discs with L4-5 radiculopathy; history of cervical disc disease and strain, and obesity.

Notwithstanding these impairments, the ALJ also found that plaintiff has the residual functional

capacity to perform sedentary work, and is therefore not disabled.

2.      Plaintiff raises two points of error:  (1) the ALJ erred in finding that plaintiff's

impairment did not "equal" the Listings of impairments for spinal disorders, 20 C.F.R. Part 404,

Subpart Plaintiff, Appendix 1, § 1.04A; and (2) the ALJ's decision was not based on substantial

evidence because he did not give sufficient deference to plaintiff's treating physicians, Dr. Amit

Poonia and Dr. Hadi Moten.

3.      As to whether plaintiff's spinal impairment equals the Listing, neither side's

arguments are very attractive.  The Commissioner advances two arguments:  First, she contends

that plaintiff does not meet the Listing because his neurological findings, including his straight-leg raising test results, were "scattered."

4.	It is true that plaintiff had some negative straight-leg raising tests (particularly on the left leg, most of his consistent positives were the right leg only). It seems fair to say that a single positive test opposed by a multitude of negative tests probably would not meet the Listing. But that is not what the record shows here. Plaintiff had many positive tests, at least equal in number to negative tests. The Listing cannot reasonably be read as requiring 100% positive tests; the only reasonable interpretation is that the tests during the period of insurance must show that the claimant has a spinal condition that causes positive straight-leg raising tests, not as a one-off or very occasional test result, but recurring throughout his treatment. That is clearly the case here.

5.	The Commissioner's second argument is that the Listing requires that the impairment last or be expected to last for at least 12 months. That might be a valid argument had the ALJ found, based on the medical record, that plaintiff's impairment would not last that long. But the ALJ did not so find, and I do not see how he could have. Plaintiff's complaint of severe pain started right after he suffered an accident at work on June 28, 2013, and continued at least through the final hearing before the ALJ nearly three years later. There is no dispute that within the insured portion of this period, he had several herniated discs in his lower back, one of which was pinching his nerve root. If the ALJ had addressed the issue one way or the other, the better view would be that the impairment seems likely to have existed or would continue for at least 12 months.

6.	Like ships passing in the night, the Commissioner's argument does not engage plaintiff's argument as to why his impairment equals the Listing. But I think plaintiff's argument

is equally unconvincing.  Plaintiff concedes that his condition does not "meet" the Listing because although he had positive straight-leg raising test, the record does not disclose whether those positive tests were in both a sitting and supine position.  (The Listing requires positive straight-leg raising tests in both positions.)  Plaintiff submits, however, that because the Listing only requires one herniated disc with a pinched nerve (that's simplifying it a bit), and he has three herniated discs, his impairment "equals" the Listing.  The regulations expressly recognize that an impairment medically equivalent to an impairment in a Listing is sufficient to meet the Listing.  See 20 C.F.R. § 416.926.

7.      However, plaintiff has cited no authority, legal or medical, for the proposition that a claimant can substitute two additional herniated discs for the Listing requirement of positive straight-leg raising test both sitting up and lying down.  There is certainly no medical opinion in the record that one equals the other.

8.      Claimants rightly complain when an ALJ comes up with his own medical opinion when it is not shared by any medical professional of record; here, plaintiff is asking the ALJ to do precisely that.  Because an ALJ could not reach such a conclusion on this record, I reject plaintiff's argument that his impairment "equals" a Listing.

9.      Plaintiff's challenge to the ALJ's decision based on the alleged failure to properly weigh the treating physician's opinion is much more significant.  In particular, the ALJ discounted Dr. Moten's medical source statement – giving his opinion "little weight" – while accepting it would have required a finding of disability.  The ALJ did this for two reasons:  (1) Dr. Moten did not start treating plaintiff until January 2016, just over a year after the end of plaintiff's date last insured (December 31, 2014); and (2) Dr. Moten's progress notes showed more complaints and findings about plaintiff's neck and upper extremities than Dr. Poonia's

notes. The ALJ also noted that for the same timing reason, he would not consider a discectomy of plaintiff's lower back that Dr. Poonia performed in April 2016. The ALJ also gave limited weight to Dr. Poonia's opinion because Dr. Poonia stated that plaintiff was 100% disabled or unable to work without identifying reasons for his conclusion. I think the ALJ's decision to diminish these doctors' opinions was flawed.

10. First of all, it is a mistake to treat Dr. Poonia and Dr. Moten as having two distinct opinions. They are both pain management specialists at the "Interventional Pain Management Center," and their treatment notes are consistent. Although Dr. Moten first saw plaintiff in January 2016 (plaintiff's insured status ended on December 31, 2014), there is no reason to think that Dr. Poonia stopped seeing plaintiff, as reflected by the fact that it was Dr. Poonia who performed the discectomy in April 2016. It is also clear from Dr. Moten's progress notes, which invariably incorporate the history taken and opinions expressed by Dr. Poonia, that Dr. Moten was relying heavily on his colleague's work from January 2016 onward. Their opinion is a continuum of treatment by the same medical practice, and the opinions expressed should be regarded as the opinion of a single treating physician.

11. Second, the ALJ's citation to plaintiff's complaints of upper back and neck pain is a distraction. Maybe plaintiff is fabricating or exaggerating his upper back and neck pain; or maybe he feels secondary muscle strain in his upper back caused by trying to take pressure off of his lower back to accommodate or distribute the lower back pain. The record is undisputed that there are no serious skeletal anomalies with plaintiff's upper back and neck, and it is equally undisputed that he has severe anomalies in his lower back. All of the MRIs, CT scans, discographies, and palpation tests either show or are consistent with three herniated discs in his lumbar/sacral region, stenosis, and at least one impinged nerve. In light of this undisputed

4

presentation of lower back compromise, there was no reason for the ALJ to discuss at such length, as he did, the one cervical MRI that plaintiff had which showed no major impairment in his upper back/neck.  If plaintiff is disabled, it is because of the condition of his lower back, not his cervical spine.

12.     Third, the continuum of treatment administered by Drs. Poonia and Moten shows a very logical progression from conservative to more aggressive treatment.  Plaintiff's work accident was in June 2013.  After several months of chiropractic and physical therapy, which gave him some but not complete improvement, he started seeing Dr. Poonia in February 2014.  Over six weeks, Dr. Poonia tried three sessions of Pulse Stimulated Treatment (P-STIM) at two-week intervals, the last session occurring in mid-March 2014.  P-STIM is (according to Dr. Poonia) a "minimally invasive procedure," but it did not help plaintiff.  Accordingly, Dr. Poonia progressed to multiple steroid injections through April 2014.  Those did not help much either (according to what plaintiff told Dr. Poonia and the ALJ).

13.     It does not appear that plaintiff received further treatment from Dr. Poonia after April 2014, but Dr. Poonia, as reflected in worker's compensation forms that he filled out, had follow-up sessions with plaintiff in from October 2014 through April 2015.  Nothing much changed.  There may have been another hiatus in treatment, but it seems likely that there were additional visits not reflected in the record because, in October 2015, Dr. Poonia performed a lumbar discography.  This is a test that, through injections of dye into targeted spinal discs, puts pressure on the discs to determine which discs, if any, are causing pain.

14.     All that need be said about plaintiff's response to this test is that it was fully consistent with his self-reporting, that is, he had very little pain in the upper part of his lumbar spine, but very severe concordant pain in L3-L5, including radiating pain to his right leg, just as

he had reported.  In other words, by putting internal pressure on these discs, Dr. Poonia was able to replicate almost precisely the pain about which plaintiff was complaining.

15.     Aided by the discography, about six months later in April 2016, Dr. Poonia performed a discectomy, in which he extracted extraneous disc material in an effort to relieve pressure.

16.     Looking at the entire course of plaintiff's treatment with Drs. Poonia and Moten through the discectomy, I cannot see the basis for the ALJ's conclusion that "there is no credible basis to relate Dr. Moten's opinions or findings back to a date when the claimant had insured status."  The ALJ apparently viewed the escalating treatment modalities as showing that plaintiff's condition deteriorated, a "worsening" as he referred to it, after the insured period, but I do not think that is the most reasonable view, because plaintiff's report of symptoms on his lower back continued essentially unchanged from the date of his accident.

17.     Except in extraordinary circumstances, few patients go from chronic back pain after an injury directly to discectomy in a matter of weeks.  They start conservatively, with manipulative therapy, and then, if necessary, to P-STIM, and then, injections and then, to discectomy (and then perhaps to spinal fusion if none of those work).  The fact that plaintiff went from accident to discectomy in less than three years does not necessarily suggest to me a deterioration.  It is just as possible that it simply reflects an escalation in treatment modalities to address a static level of chronic pain that was not responding to the prior step of less aggressive treatment.

18.     At least, that is one possibility.  There are other reasons in this record which might support the ALJ's post-insured deterioration theory.  But one of those reasons is not the underweighting of the opinions of plaintiff's treating physicians.  The diagnoses of plaintiff's

condition by Drs. Poonia and Moten never materially changed, whether during the insured period or after it. Because the treating physician rule is such a fundamental part of the disability analysis, its misapplication requires remand.

19. The ALJ made other observations that also give me pause, and made it seem like he was reaching for reasons to find non-disability. The ALJ diminished the severity of plaintiff's impairment by commenting that, according to a March 28, 2014 progress note from Dr. Poonia, plaintiff was "only" taking NSAIDs, Naprosyn, and Flexeril. The latter two seem strong enough to me to support plaintiff's complaints, but I also think the ALJ misread the treatment note when he summarized it as "indicat[ing] that the claimant's pain was fairly well managed without significant medication." That is not what Dr. Poonia said, and I do not think that conclusion can be found anywhere in the treatment notes. The treatment notes state that plaintiff was taking NSAIDs, Naprosyn, and Flexeril, and that "was also given Percocet 10/325 mg Q4-6 hrs PRN for breakthrough pain control." I see nothing in the note stating that plaintiff's pain was "well-managed"; to the contrary, plaintiff estimated his pain as 6 to 7 out of 10 without medication and expressed a litany of limitations of and relating to pain (for example, "pain is worst throughout the day and is constant in frequency.").

20. The ALJ also interpreted the March 28, 2014 note as stating that "the claimant did not need pain medication on that day." That is not at all what Dr. Poonia said. He said: "Patient *does* require *refills* for his pain medication today" (emphases added) and, under the portion of his notes labeled "recommendations/plan," he said "[p]atient does require pain medication today." In other words, plaintiff needed refills of the prescriptions he was taking. That in no way supports the inference that the ALJ made that plaintiff had little or no pain that day. And the treatment notes of Drs. Poonia and Moten reflect a number of occasions on which plaintiff

obtained refills on his prescriptions – including prescriptions for heavier painkillers like Percocet or Oxycodone.

21.     The ALJ also drew what I think was an unfair negative inference from the fact that in speaking to his doctors, plaintiff consistently mentioned his difficulty in standing and walking, but never mentioned difficulty in sitting.  This inference removes plaintiff's statements from the context in which they were given.  In talking to his doctors, the issue on the table was always whether plaintiff was ready to resume his work as a porter consistent with the requirements of worker's compensation.  A porter has to stand and walk.  It is a medium exertional level job, not a sedentary job.  See Dictionary of Occupational Titles 382.664-010.  It is not as if plaintiff ever said that he was able to sit for a prolonged period; had he done so, the ALJ's observation would be correct.  It is unsurprising that neither plaintiff nor his doctors discussed how long he could sit because that was not the issue before them.

22.     Even treating the opinions of Drs. Poonia and Moten separately, the ALJ took Dr. Poonia's opinions out of context when he discounted them.  Dr. Poonia never opined on plaintiff's residual functional capacity because he was never asked to.  Instead, between October 2014 and April 2015, he completed six C-4.2 worker's compensation board forms.  As the form states in its preamble, it is used to document a temporary injury, not a permanent one.  It warns the doctor that the failure to complete the form "may delay the payment of necessary treatment, prevent the wage loss benefits to the injured worker, create the necessity for testimony [before the workers' compensation board], and jeopardize your Board authorization."  The purpose of this form is very apparent – the Workers' Compensation Board needs to know if a worker is ready to return to work, and understandably requires frequent updates on the worker's status.

8

23. The relevant portions of the form for our purposes are Sections E, entitled "Doctor's Opinion (based on this examination)," and Section F, entitled "Return to Work." On each form, Dr. Poonia completed question E-4 – "What is the percentage (0-100%) of temporary impairment" – by writing in "100%." Question E-5 asked him to "Describe findings and relevant diagnostic test result"; Dr. Poonia answered "positive straight leg raising" and "positive Lasegue's Test." (He could have also noted the July 2013 MRIs showing three ruptured discs and nerve compression in the lumbar-sacral region). Question F-2 asked whether the patient could return to work at that time, and Dr. Poonia checked the answer choice "The patient cannot return to work because," and wrote in "unable to work due to current pain symptoms."

24. The ALJ discounted these assessments because they "do not assess the claimant's residual functional capacity, but merely make conclusory statements." That is true, but that is all that the form required. Putting aside for the moment my view that Dr. Poonia and Dr. Moten should be regarded as a single treating physician, Dr. Poonia's answers on this form were entirely consistent with his progress notes and the objective tests showing three ruptured discs with nerve impingement.

25. Once the proper weight is afforded to plaintiff's treating physicians, it becomes a close question as to whether the matter should be remanded for another hearing and re-evaluation or simply to calculate benefits (although plaintiff has not asked for the latter relief). I conclude that the record, even as rebalanced, is not so one-sided as to preclude reconsideration by an ALJ. As suggested above, there is at least some support for the ALJ's theory that plaintiff's impairment only approached a level of disability after his date last insured. The ALJ noted, for example, that a few months after his accident, an internist, Dr. Damian Martino, made only "mild neurological findings." That may be somewhat of an understatement, as while Dr. Martino

9

found no evidence of trauma in the lumbar spine in his first examination of plaintiff in October 2013, he changed his view a month later, finding evidence of lumbar spine trauma. In addition, Dr. Martino's opinion could also be reasonably discounted because he is not a specialist in the area of plaintiff's impairment.

26.     But the main reason to remand for another hearing in lieu of skipping to a benefits calculation is that the ALJ was convinced that plaintiff was not a credible witness. The ALJ made as express a finding that plaintiff was exaggerating or fabricating his symptomology as I have seen in any review case: "[T]he claimant's statements regarding his lack of improvement with various therapies and severely restricted ability to perform work related functions are predicated to support workers compensation and Social Security disability claims rather than a true assessment of his abilities and limitations." In other words, plaintiff was making up or overstating his pain to get benefits.

27.     The case, in my view, turns on this conclusion because the objective medical record is undisputed. Plaintiff has a pinched nerve in his lower back and three herniated discs, as shown on his 2013 MRI. The ALJ acknowledged this. It is entirely possible that someone with plaintiff's condition not to be able to sit at a desk for the time necessary to perform a sedentary job, but it is also entirely possible that someone with this condition could do sedentary work.

28.     Because the same condition can manifest differently from claimant to claimant, the ALJ's conclusion that plaintiff's self-reporting was deliberately skewed to enhance his benefits claim has a ripple effect over the rest of the record. It is not only the ALJ who is being asked to accept plaintiff's conclusion that he cannot sit for any length of time. It is plaintiff's treating physicians who are also being asked to accept it, and they are more likely to do so than the ALJ, at least where the objective medical tests (both the MRI and many of the motion tests)

are not inconsistent with it. So when plaintiff's treating physicians ask how much pain plaintiff

has on a scale of 1 to 10, and plaintiff reports 6 to 7 or 9 out of 10 (at different times), his

treating physicians assume that he has a very severe impairment.

29.     The ALJ noted the fact, as bearing on plaintiff's credibility, that plaintiff had

testified that he had obtained 75% improvement by visiting a chiropractor after his accident.

However, the ALJ was not clear as to whether he found plaintiff's theory that he would not

recover the other 25% as evidence that plaintiff was exaggerating his pain, or whether the 75%

improvement was enough by itself to show that plaintiff can sit long enough to do sedentary

work. Either way, it be might be unrealistic to take plaintiff's lay estimate of 75% improvement

through chiropractic manipulation as evidence of deliberate exaggeration.

30.     The other problem with the ALJ's finding that plaintiff is deliberately dissembling

is that it is not supported by his course of treatment. Plaintiff would have not only had to fool

Dr. Poonia into thinking he had disabling pain, but he would have voluntarily subjected himself

to many manipulative therapy sessions, several P-STIM procedures, multiple spinal injections,

discography, and discectomy just to back up his claim. It is not impossible; people do all kinds

of things to get money. But a finding of fabrication to this extent has to be tested against the

objective medical evidence showing a condition that is fully consistent with plaintiff's self-

reporting, as well as the fact that Dr. Poonia and Moten, who had more contact with plaintiff than

an ALJ ever will, did not think they were being bamboozled.

31.     For these reasons, plaintiff's motion for judgment on the pleadings is granted and

the Commissioner's motion for judgment on the pleadings is denied. The case is remanded to

the Commissioner to conduct a *de novo* hearing subject to the following directions: (1) re-

evaluate the weight to be given to the findings and opinions of Drs. Poonia and Moten under the

treating physician rule; (2) reconsider whether plaintiff is fabricating or exaggerating his symptomology; and (3) obtain testimony from an orthopedic medical expert, after a review of the entire record, on the issue whether plaintiff's was able to do sedentary work during the insured period.

32.      The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
       July 3, 2018